IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

TRACY LYNN SCHILO,           )
                             )
            Plaintiff,       )
                             )
      v.                     )        CIVIL ACTION NO. 08-1340
                             )
MICHAEL J. ASTRUE,           )
COMMISSIONER OF SOCIAL       )
SECURITY,                    )
                             )
            Defendant.       )

## <u>MEMORANDUM OPINION</u>

CONTI, District Judge.

## I.    INTRODUCTION

Plaintiff Tracy Lynn Schilo ("Schilo" or "plaintiff") brought this action pursuant to 42

U.S.C. § 405(g) seeking review of the final determination of the Commissioner of Social

Security ("Commissioner" or "defendant") denying her application for disability insurance

benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-33.  The

parties filed cross-motions for summary judgment, and the record was developed at the

administrative level.

## II.   PROCEDURAL HISTORY

Schilo filed an application for DIB benefits on March 25, 2004, alleging disability since

December 3, 2002, due to low back and neck injury. (R. at 52-55, 79.)  Her claims were initially

denied, and she filed a timely request for an administrative hearing. (R. at 39-43, 106-12.)  A

hearing was held on October 21, 2005, in Pittsburgh, Pennsylvania, before an administrative law

judge (the "ALJ").  (R. at 429-55.)  Plaintiff was represented by counsel and a vocational expert

(the "VE") appeared and testified. (*Id.*)  The ALJ issued an unfavorable decision on August 24, 2006, finding that the plaintiff was "not disabled" within the meaning of the Act. (R. at 17-28.) The ALJ's decision became the Commissioner's final decision when, on August 1, 2008, the Appeals Council denied plaintiff's request for review. (R. at 4-6.)  Plaintiff's administrative remedies were exhausted and she brought the instant action seeking review of the Commissioner's final decision.  The matter is before this court on the cross-motions for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

III.    **Plaintiff's Personal and Medical Background**

Schilo was born on October 7, 1965. (R. at 52.)  She is currently forty-four years old and was thirty-eight (38) years old at the time she applied for benefits and forty years old at the time of the administrative hearing.  Under the applicable regulations, applicants under the age of fifty are considered "younger individuals" and their age is not considered a significant impediment to their ability to acclimate to unfamiliar occupational circumstances.  20 C.F.R. § 404.1563(c).

Schilo completed the tenth grade and later earned her GED.  (R. at 85, 432.)  She does not have any specialized vocational training, although she did learn to drive a tractor-trailer while working for Pepsi-Cola Bottling Company ("Pepsi") by "practic[ing] on their trucks." (R. at 85, 433, 435.)  Schilo's past relevant work experience consisted of approximately nine years as a line worker and a cook for Budget Gourmet, and nearly ten years as a delivery salesperson for Pepsi. (R. at 80, 433-35.)  The cook position and delivery salesperson position were considered heavy and semi-skilled labor.  (R. at 450.)  There was also a line production position Schilo performed at Budget Gourmet which was considered to be light and unskilled work. (*Id.*)  Schilo

2

discontinued working for Pepsi following her injury on December 3, 2002,[1] due to her back and neck pain. (R. at 79.)

Schilo allegedly became disabled after she was in an accident which occurred on December 3, 2002, while she was working for Pepsi. (R. at 113.)  On that day Schilo, while making a delivery to the Brighton Hot Dog Shoppe in Beaver Falls, Pennsylvania, slipped on a patch of "black ice," fell, and landed on her buttocks, low back, and right elbow.  (R. at 67, 145.) She was able to complete her duties for that day and reported her injury when she returned to the shop at the end of her shift.  (R. at 145.)  Schilo initially received temporary disability benefits under the Pennsylvania Workers' Compensation Act.[2]   (R. at 67.)

Pepsi sought to suspend or terminate Schilo's workers' compensation benefits by filing a combination petition on June 16, 2003, pursuant to the Pennsylvania Workers' Compensation Act, 77 Pa. Cons. Stat. Ann. § 772, asserting that Schilo was fully recovered from her December 3, 2002 injury, or alternatively that she was capable of performing a specific job offered to her which would eliminate any further loss of wages.  (R. at 66.)  On April 27, 2005, a workers' compensation judge issued a decision denying and dismissing Pepsi's combination petition.  (R. at 66-67.)  Schilo continued to receive her disability benefits until settling her workers' compensation claim against Pepsi on February 15, 2007.  Pl.'s Br. 3 n.4.

---

[1]Schilo did briefly perform light duty for Pepsi, which mainly consisted of putting stickers on products and working with displays.  (R. at 434-35).  Schilo attempted to work for part of one day doing her previous job with Pepsi in February 2003, but was unable to complete her duties due to her pain.  (R. at 445-46).

[2]77 Pa. Cons. Stat. Ann. §§ 1 *et seq.*

The Pennsylvania Workers' Compensation Act requires a claimant to treat with "panel providers," – doctors "listed" by the employer – for a period of ninety days following a work accident.  77 PA. CONS. STAT. ANN. §531(1)(i).  Schilo treated with three panel providers during the statutory period following her accident: Daniel A. Nackley, M.D., ("Dr. Nackley), Howard J. Senter, M.D. ("Dr. Senter"), and Adnan A. Abla, M.D. ("Dr. Abla").

During the period from December 3, 2002, through March 25, 2003, Schilo was treated by Dr. Nackley, an occupational medicine specialist.[3]  (R at 125-56.)  Dr. Nackley examined Schilo on the day of the accident and noted that she appeared uncomfortable with a mildly antalgic gait, but was in no acute distress and did not exhibit tenderness to palpation in the cervical or thoracic spine.  (R. at 145.)  Tenderness over the lumbosacral spine and the sacrum was detected, but no tenderness of the hip or ecchymosis was noted.  (*Id.*)  Schilo was prescribed 600 mg of ibuprofen three to four times a day.  (*Id.*)

Dr. Nackley diagnosed Schilo with lumbosacral sprain and cervical sprain, and embarked on a course of treatment to include ibuprofen, Celebrex, and Flexeril, as well as a course of physical therapy.  (R. at 133, 135, 139, 143.)  Schilo complained of neck and right elbow discomfort during her treatment with Dr. Nackley.  (R. at 133, 139, 143.)  Dr. Nackley's treatment notes consistently report that Schilo was in no acute distress, had mild tenderness of the lumbosacral and cervical spine regions, that her heel and toe walking were intact, and that her cervical range of motion was within normal limits.  (R. at 126, 129, 131, 133, 135, 137, 139, 141, 143.)

---

[3]The record reflects that Schilo treated with Dr. Nackley from February 11, 2002 until June 25, 2002, for a previous work injury involving her back, which was sustained on February 8, 2002. (R. at 147-57.)

After attempting to return to her regular work duties on February 3, 2003, Schilo aggravated her condition and was seen by Dr. Nackley the following day. (R. at 133.) Schilo reported to Dr. Nackley that she was experiencing increasing low back pain radiating into the right leg, neck discomfort, and a headache. (*Id.*) Dr. Nackley's examination revealed no focal bony cervical spine tenderness and excellent cervical range of motion. (*Id.*) He noted tenderness in the right sacroiliac joint radiating into the right buttock with palpation, and limited flexion in the lumbar region. (*Id.*) Dr. Nackley recommended an MRI of the cervical and lumbosacral spine. (*Id.*)

A lumbar MRI performed on February 13, 2003, indicated no fracture or disc herniation. (R. at 121.) Slight to mild degenerative disc changes with very small posterior central disc bulges were observed at the L4-L5 and L5-S1 levels. (*Id.*) The MRI of the cervical spine revealed no fracture, displacement, or intrinsic abnormality. (R. at 120.) Mild foraminal narrowing was seen at C5-C6 with a very small focal disc herniation at that level extending into the right foramen. (*Id.*)

On March 11, 2003, Schilo was seen by Dr. Senter, a neurosurgeon, on referral by Dr. Nackley. (R. at 122-24, 128-30.) Dr. Senter's examination revealed mild tenderness in the right sciatic notch, unlimited range of motion to flexion and extension without pain, heel and toe walking within normal limits, negative straight leg raise, and negative hip rotation. (R. at 122.) He observed no winging of the scapula. (*Id.*) Dr. Senter reviewed the MRI scan and assessed that the abnormalities in the cervical and lumbar spine were not related to Schilo's current symptomatology. (R. at 123.) Dr. Senter recommended that Schilo return to light work duty for a

month, after which she could return to full work duty.  (*Id.*)  Dr. Senter's examination revealed that Schilo was pregnant.  (R. at 122, 126.)

Schilo's final visit with Dr. Nackley was on March 25, 2003, at which time he prescribed light work conditioning and strengthening through physical therapy.  (R. at 126.)  Dr. Nackley found that Schilo could occasionally lift up to twenty-five pounds, and, with the exception of climbing, crawling, or driving a standard transmission vehicle, could occasionally perform all postural maneuvers.  (R. at 127.)  Dr. Nackley anticipated that Schilo could return to work full duty on April 11, 2003, which was in accordance with Dr. Senter's findings.  (R. 126-27.)

Schilo was seen for a second surgical opinion on April 4, 2003, by Dr. Abla, a neurosurgeon.  (R. at 169-72.)  Dr. Abla's examination disclosed significant paravertebral muscular tightness and tenderness in the right sacroiliac joint, as well as tightness with limited flexion and extension of the cervical musculature.  (R. at 170.)  Heel and toe walking were within normal limits.  (*Id.*)  Straight leg raising was negative to 90 degrees.  (*Id.*)  Dr. Abla recommended physical therapy for the neck and lower back, pain clinic treatment consisting of a right sacroiliac joint injection, swimming regularly for muscle strengthening, a muscle relaxant at bedtime, and a nonsteroidal anti-inflammatory medication.  (R at 170-71.)  Dr. Abla did not recommend neck or back surgery.  (R. at 170.)

Schilo began treating with Milton J. Klein, D.O. ("Dr. Klein"), on April 29, 2003.  (R. at 364.)  Schilo was four months pregnant at the time, and was not taking medication or engaging in physical therapy treatment.  (*Id.*)  Dr. Klein provided Schilo a sample supply of topical Lidoderm 5% lidocaine analgesic patches, to be utilized if approved by her OB-GYN, and referred Schilo to physical therapy three times per week for four weeks.  (R. at 365.)  Dr. Klein anticipated that

6

Schilo would be work disabled until after the completion of her pregnancy, when more treatment options would be available to rehabilitate Schilo to resuming her regular work activities. (*Id.*)

On May 16, 2003, James L. Cosgrove, M.D. ("Dr. Cosgrove"), performed an independent medical evaluation of Schilo. (R. at 176-82.) Dr. Cosgrove's physical examination of Schilo revealed normal range of motion of the neck, full flexion, extension, side bending and rotation of the lumbar spine, both seated and standing, mild tenderness to palpation over the right sacroiliac area, and normal straight leg raise. (R. at 181.) Dr. Cosgrove concluded that Schilo's mild sacroiliac tenderness was not unusual given her pregnancy and that she had fully recovered from her work injury. (R. at 181-82.)

Dr. Klein reported on June 3, 2003, that Schilo's OB-GYN did not authorize the use of the Lidoderm 5% lidocaine topical patches, and that Schilo was taking regular strength Tylenol for analgesia. (R. at 360.) Dr. Klein recommended continuing physical therapy and a regular home exercise program. (*Id.*)

Schilo received physical therapy treatment from May 6, 2003, until August 22, 2003, at which time she was discharged due to limitations in treatment due to her pregnancy. (R. at 183, 360.) At the time it was noted that Schilo continued to experience cervical and upper back pain and significant right lumbar and sacral area pain. (*Id.*) It was observed that Schilo had not achieved all goals due to her pregnancy. (*Id.*) Schilo was instructed on the use of a TENS[4] unit for her cervical pain. (*Id.*)

---

[4]TENS is an abbreviation for "transcutaneous electrical nerve stimulation" which is indicated in the management of pain by interfering with the transmission of painful stimuli. Taber's Cyclopedic Med. Dict., 2218 (20th ed. 2005).

Schilo was evaluated on July 8, 2003, by Thomas D. Kramer, M.D. ("Dr. Kramer"). (R. at 345.) Dr. Kramer reviewed the February 13, 2003, MRI results[5] and diagnosed annular tears at the L4-L5 and L5-S1 levels. (*Id.*) Dr. Kramer recommended that Schilo undergo a lumbar discography after her pregnancy to determine the pain generator. (*Id.*) Dr. Kramer did not believe that Schilo was able to work at that time. (*Id.*)

Schilo was seen by Dr. Klein on July 28, 2003, and she reported that her low back pain was unchanged, but that her cervical pain was slightly improving. (R. at 353.) Dr. Klein observed right piriformis muscle spasm and tenderness, right trochanteric bursitis, and right cervical-dorsal and lumbosacral myofacial syndrome. (*Id.*) Dr. Klein recommended the use of a TENS unit and cervical traction. (*Id.*) Dr. Klein opined that Schilo was work disabled. (*Id.*)

Schilo's daughter was born on October 23, 2003, weighing eight pounds eight ounces. (R. at 350.)

Schilo was examined by Dr. Klein on December 1, 2003, and her chronic, predominately right low back pain radiating into the right leg was noted. (R. at 350.) Schilo also reported occasionally experiencing "giveway" of the right leg. (*Id.*) Dr. Klein's examination revealed post-traumatic discogenic lower back pain, cervical-dorsal and lumbosacral myofacial syndrome, and discogenic/osteoarthritic right cervical pain. (*Id.*) Dr. Klein prescribed the nonsteroidal anti-inflammatory medication Bextra,[6] and stated that Schilo remained work disabled. (R. at 350-51).

---

[5]The report indicates that the MRI was conducted on December 13, 2002. During Dr. Kramer's deposition, however, it was agreed that the MRI results referenced in this report were from the February 13, 2003 MRI. (R. at 324-25).

[6]"Bextra was withdrawn from the U.S. market in 2005. It was a "nonsteroidal anti-inflammatory drug[] (NSAID[]) . . . . Bextra is used to reduce pain, inflammation, and stiffness caused by osteoarthritis and adult rheumatoid arthritis."

Schilo returned to Dr. Kramer's office on December 9, 2003, and was found on examination to have minimal tenderness on palpation of the lumbar spine, negative straight leg raise, and no focal deficits in the neurological system.  (R. at 344.)  Dr. Kramer diagnosed annular tears at L4-L5 and L5-S1 and prescribed an IDET procedure followed by discography.  (*Id.*)

Mark R. LoDico, M.D. ("Dr. LoDico"), evaluated Schilo on January 13, 2004, on referral from Dr. Kramer.  (R. at 374-76.)  On examination, Dr. LoDico noted decreased range of motion with extension in the lumbar spine due to pain and tenderness to palpation of the right-sided lumbar paraspinal muscles.  (R. at 375.)  Schilo was able to heel walk, toe walk, and squat with minimal difficulty, and her straight leg raise was negative.  (*Id.*)  Dr. LoDico prescribed Ultracet,[7] Tylenol 3000 mg, and Bextra, and scheduled a provocative discography.  (R. at 375-76.)

---

Serious . . . reactions include:
> skin rash; hives; itching; difficulty breathing; swelling of the lips, tongue or face . . . . [A]bdominal pain, tenderness, or discomfort; nausea; bloody vomit; bloody, black, or tarry stools; unexplained weight gain; swelling or water retention; fatigue or lethargy; a skin rash; itching; yellowing of the skin or eyes;"flu-like" symptoms; or unusual bruising or bleeding. These symptoms could be early signs of dangerous side effects.

Less serious side effects may include: "diarrhea; nausea or upset stomach; or headache."
http://www.drugs.com/bextra.html (last visited February 8, 2010).

[7]Ultracet is  "acetaminophen and tramadol" which is "used to treat moderate to severe pain."  Side effects may include: "seizure (convulsions); a red, blistering, peeling skin rash; or shallow breathing, weak pulse.  Less serious . . . side effects may include: dizziness, drowsiness, weakness; nausea, vomiting, constipation, loss of appetite; blurred vision; flushing (redness, warmth, or tingly feeling); or sleep problems (insomnia)."
http://www,drugs.com/ultracet.html (last visited February 8, 2010).

Dr. LoDico performed the provocative discography on February 5, 2004, at the L5-S1, L4-L5, L3-L4, and L2-L3 levels.  (R. at 372.)  The results of the procedure revealed that Schilo had annular disruption of the disc at the L5-S1 level and the L4-L5 level. (R. at 373.)  A post discogram CT of the lumbar spine indicated a small interannular tear at L4-L5 resulting in slight left-sided disc protrusion and a degenerative disc at L5-S1. (R. at 377.)

Dr. Kramer saw Schilo on February 24, 2004, and reported that the discography indicated that her pain generator was at the L5-S1 level, and the L4-L5 disc produced discordant pain.  (R. at 343.)  Dr. Kramer's diagnosis was discogenic low back pain at L5-S1. (*Id.*)

During an examination on March 22, 2004, Dr. Klein found continued right cervical-dorsal myofacial syndrome, right iliolumbar syndrome, right trochanteric bursitis, and right piriformis syndrome.  (R. at 346.)  Dr. Klein reported diskogenic/osteoarthritic right cervical pain at C5-C6.  (*Id.*)  Dr. Klein stated that Schilo continued to be work disabled.  (R. at 347.)

Schilo returned to Dr. LoDico's office on March 30, 2004, at which time he scheduled an IDET procedure, which was recommended by Dr. Kramer.  (R. at 371.)

Schilo was treated by Dr. Klein on October 7, 2004, at which time he reported that the IDET procedure still had not been approved by worker's compensation.  (R. at 401.)  The examination yielded evidence of multiple right-sided lumbosacral/pelvis soft tissue findings in addition to the usual findings, but the diagnoses remained unchanged.  (*Id.*)  Dr. Klein prescribed

an RS-4 neuromuscular stimulator unit for self-treatment of low back pain as well as Vicodin[8] and Bextra. (*Id.*) Dr. Klein maintained that Schilo continued to be work disabled. (*Id.*)

Stephen M. Thomas, M.D., a certified pain medicine specialist, issued a determination for the Bureau of Workers' Compensation on October 13, 2004, finding that the performance of the IDET procedure was reasonable and necessary at the L5-S1 level, but unreasonable and unnecessary at the L4-L5 level. (R. at 412-17.)

Schilo was seen by Dr. Klein on December 30, 2004, and was prescribed a TENS unit because coverage was denied for the RS-4 neuromuscular stimulator unit. (R. at 400.) Her prescription for Bextra was changed to generic Motrin 800 mg. (*Id.*)

Schilo was evaluated by Robert P. Durning, M.D. ("Dr. Durning"), on June 9, 2005, and Dr. Durning memorialized his findings from that examination in a September 9, 2005 correspondence. (R. at 402-11.) Dr. Durning concluded that Schilo's work injury aggravated a pre-existing condition, and that her work injury did not result in any true anatomic or structural damage. (R. at 407.) Dr. Durning stated that Schilo's symptoms exceeded her physical abnormalities, suggesting symptom magnification, overstatement, or exaggeration. (*Id.*) Dr. Durning did not consider the IDET procedure to be effective, and did not recommend it. (*Id.*) He further recommended Schilo's gradual discontinuation of Vicodin. (*Id.*) Dr. Durning opined that Schilo was capable of performing work at the sedentary, light and modified medium exertional levels. (*Id.*)

---

[8]Vicodin is "[h]ydrocodone bitartrate and acetaminophen" and "is an opioid analgesic and antitussive . . . ." Physicians' Desk Reference 529 (63rd ed. 2009). Prescribed "for the relief of moderate to moderately severe pain . . . . The most frequently reported adverse reactions include: lightheadedness, dizziness, sedation, nausea and vomiting." Id.

Dr. Durning determined that Schilo could stand and walk up to four hours at a time up to a total of eight hours in a work day, could sit for two hours at a time up to a total of eight hours in a work day, could drive for two hours at a time up to a total of eight hours in a work day and could frequently carry twenty to twenty-five pounds and occasionally carry thirty to thirty-five pounds. (R. at 409.)  Dr. Durning found that Schilo could bend frequently and was unrestricted in the performance of all other postural maneuvers.  (R. at 410.)

Dr. Klein increased the potency of Schilo's Vicodin prescription on June 16, 2005, and also prescribed Ambien[9] and provided a sample of Lunesta,[10] to be tried before filling the Ambien prescription.  (R. at 398.)  Dr. Klein reported that Schilo was permanently work disabled. (*Id.*)[11]

---

[9]"Ambien (zolpidem tartrate) is indicated for the short-term treatment of insomnia characterized by difficulties with sleep initiation." Physician's Desk Reference, 2692 (63rd ed. 2009). "The most common side effects . . . are: drowsiness[;] dizziness[;] diarrhea[;] drugged feelings." Id. at 2696.

[10]"Lunesta (eszopiclone) is a nonbenzodiazepine hypnotic agent. . . ." Physicians' Desk Reference, 2994 (63rd ed. 2009).  "Lunesta is indicated for the treatment of insomnia." Id. at 2995.  "The most commons side effects . . . are: unpleasant taste in mouth, dry mouth[;] drowsiness[;] dizziness[;] headache[;] symptoms of the common cold[;] . . . feel[ing] drowsy the next day. . . . " Id. at 2998.

[11]Plaintiff submitted additional medical records, which post-dated the hearing before the ALJ, to the Appeals Council, which the Appeals Council made part of the record.  Those additional materials included the following reports.

Dr. LoDico performed the IDET procedure on May 10, 2006, at the L4-L5 and L5-S1 disc levels.  (R. at 421-22.)

Schilo reported on June 15, 2006, to Lloyd G. Lamperski, M.D. ("Dr. Lamperski"), that the IDET procedure was not successful in alleviating her pain and may have, in fact, made it worse.  (R. at 423-24.)  Dr. Lamperski's physical examination disclosed some lower lumbar spinal tenderness, but otherwise normal findings.  (*Id.*)  Dr. Lamperski prescribed physical therapy and recommended weaning off the back brace.  (*Id.*)  Schilo attended one physical therapy treatment and did not return, resulting in her discharge. (R. at 420).

Dr. Klein examined Schilo on September 7, 2006, and his findings and diagnoses remained unchanged.  (R. at 428.)  Dr. Klein recommended that Schilo seek a second opinion regarding spinal orthopedic surgery, and prescribed Vicodin and Lunesta. (*Id.*)  Dr. Klein

According to Schilo's testimony at the administrative hearing, she takes , among other things, Vicodin three times a day.  (R. at 440.)   She uses her TENS unit about three times per day. (R. at 440.)  Her daily activities consist of getting her three teenage children off to school, waking up her two-year-old daughter and feeding her breakfast and lunch, and watching a little television. (R. at 440, 448.)   She is able to do some housework, grocery shopping, and errands with the help of her fiancé and her older children.  (R. at 440-41, 448-50.)

The testimony of the VE at the administrative hearing indicated that a hypothetical individual sharing Schilo's restrictions and limitations could perform work existing in the national economy at the light exertional level as a line production worker, a packer, an inspector, or a sorter/grader.  (R. at 451.)

After determining that Schilo met the insured status requirements of the Act through the date of the decision, and had not engaged in substantial gainful activity at any time relevant to the decision, the ALJ found Schilo's degenerative disc disease at the L5-S1 level and degenerative disc disease with a bulge at the C5-C6 level to be severe impairments within the meaning of the applicable regulations, but did not meet or medically equal, either singly or combination with other alleged impairments, any of the listings in 20 C.F.R. part 404, subpart P, appendix 1, regulations No. 4 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526).  (R. at 21-22.)  The ALJ determined that Schilo maintained the residual functional capacity ("RFC")[12] to engage in work

---

reiterated that Schilo remained permanently work disabled.  (*Id.*)  Schilo reported that she was taking a part-time court reporter training program, and that the prolonged sitting was problematic.  (*Id.*)

[12]Residual functional capacity is "the most [the claimant] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a).

13

activity at the light exertional level subject to certain modifications, which allow for a sit-stand option and would  permit Schilo to stand and walk continuously for four hours before needing to sit, limited head rotation, and limitations in postural movements.  (R. at 22-27.)  Ultimately, the ALJ concluded that, although Schilo was unable to return to any of her past relevant work, a significant number of jobs existed in the national economy that Schilo could perform, considering her age, education, work experience, and RFC, and therefore she was not disabled within the meaning of the Act at any time relevant to the rendering of the ALJ's decision.  (R. at 27-28.)

## IV.    STANDARD OF REVIEW

This court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994).  The court may not undertake a *de novo* review of the Commissioner's decision or reweigh the evidence of record.  *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). Congress has expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)(quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside, even if this court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  "Overall, the substantial evidence standard is a deferential standard of review."  *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004)(citing *Schaudeck v. Comm'r of Soc. Sec. Admin.*, 181 F.3d 429, 431 (3d Cir. 1999)).

## V.    DISCUSSION

In order to establish a disability under the Act, a claimant must demonstrate a "'medically determinable basis for an impairment that prevents him from engaging in any "substantial gainful activity"' for a statutory twelve-month period.'" *Stunkard v. Sec'y of Health and Human Servs.*, 841 F.2d 57, 59 (3d Cir. 1988)(quoting *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987); 42 U.S.C. § 423(d)(1).  A claimant is considered to be unable to engage in substantial gainful activity "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . . " 42 U.S.C. § 423(d)(2)(A).  To support an administrative law judge's ultimate finding, an administrative law judge must do more than state factual conclusions.  The administrative law judge must make specific findings of fact.  *Stewart v. Sec'y of HEW*, 714 F.2d 287, 290 (3d Cir. 1983).  The administrative law judge must consider all medical evidence contained in the record and must provide adequate explanations for disregarding or rejecting evidence. *Weir ex rel. Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its rulemaking authority under 42 U.S.C. § 405(a), developed a five-step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act.  The United States Supreme Court has summarized this process as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further.  At the first step, the agency will find nondisability unless the claimant shows that he is not working at a "substantial gainful activity." [20 C.F.R.] §§ 404.1520(b), 416.920(b).  At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of

15

impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c).  At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d).  If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled.  If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003)(footnotes omitted).

Plaintiff raises four arguments: 1) the ALJ did not properly credit her subjective complaints of pain or consider her long work history in making an adverse credibility determination when rendering his decision; 2) the ALJ failed to address plaintiff's diagnosis of annular tears; 3) the ALJ failed to give appropriate weight to the opinions of plaintiff's treating physicians; and 4) the ALJ failed to weigh properly the decision of the workers' compensation judge.

The Commissioner's position is that substantial evidence supports the ALJ's findings. Each argument will be addressed.

**A.  Credibility evaluation**

In addition to considering the medical evidence, an administrative law judge is required to consider nonmedical evidence offered by a claimant, including evidence of her limitations.  *Smith v. Califano*, 637 F.2d 968, 972 (3d Cir. 1981).  A claimant's subjective complaints of physical pain and other symptoms must be supported by objective medical evidence.  20 C.F.R. § 1416.929(c).  "'The authority to evaluate the credibility of [the claimant] concerning pain and

16

other subjective complaints is reserved for the ALJ.'"  *Gilmore v. Barnhart*, 356 F.Supp.2d 509,

513 (3d Cir. 2005) (quoting *Bryan v. Barnhart*, No. Civ.A. 04-191, 2005 WL 273240, at *3 (E.D.

Pa. Feb. 2, 2005) (citing *Van Horn v. Schweiker,* 717 F.2d 871, 873 (3d Cir. 1983))).  While an

administrative law judge must give a claimant's subjective complaints "serious consideration,"

*Powell v. Barnhart*, 437 F.Supp.2d 340, 342 (E.D.Pa. 2006) (citing *Burns v. Barnhart*, 312 F.3d

113, 129 (3d Cir. 2002)), "the ALJ may reject a claimant's complaints if he does not find them

credible." *Id.* (citing *Schaudeck v. Comm'r of Soc. Sec.,* 181 F.3d 429, 433 (3d Cir. 1999)); *see*

*Baerga v. Richardson*, 500 F.2d 309, 312 (3d Cir. 1974), *cert. denied*, 420 U.S. 931 (1975))

(holding that an administrative law judge  may reject a claimant's subjective complaints, but

expressed concern that the administrative law judge did not address certain testimony relating to

the claimant's limitations, noting that "failure to reject [that] testimony could lead to a conclusion

that he neglected to consider it all.").

In the instant matter, the ALJ did not address plaintiff's subjective complaints of pain in

his decision.  Although the ALJ noted that Dr. Durning indicated that plaintiff may be

exaggerating or magnifying her symptoms, (R. at 25), that concern does not relieve the ALJ of his

duty to consider plaintiff's subjective complaints of pain found, among other places, in her

hearing testimony.  Her testimony in this case included:

> I can walk about a block, two blocks, I'm starting to feel a lot of pain.
> Standing, five, ten minutes.  I got to keep moving around and shifting,
> and I'm in pain.  I try not to.

(R. at 439.)

> I can lift, you know, 10 or 15 pounds once.  But if I got to do
> it more than one time, like repetitive, it's impossible.  I just
> can't do it.

 (*Id.*)

I cannot sit.  I'm just in pain all the time.  My back hurts all the time.

(R. at 442.)

This testimony is inconsistent with the ALJ's RFC determination that plaintiff is capable of standing and walking continuously for four hours before needing to sit, can sit for two hours before needing to change position, and can lift and carry 20 pounds occasionally and 10 pounds frequently.  (R. at 22.)  The ALJ, however, did not address this testimony or provide any reason why this evidence was not credited.

The ALJ credited Dr. Durning's findings that plaintiff "can do all household chores and [care] for her daughter." (R. at 26.)  This finding, however, is contradicted by plaintiff's testimony that her children help her with the laundry and the cooking and cleaning because she cannot do it by herself, (R. at 440-41), that her children clean the house, sweep and dust, carry everything that plaintiff needs, and that her older children help in the care of the two-year-old child.  (R. at 449-50.)  Again, plaintiff's evidence is not discussed in the ALJ's analysis, and the court cannot discern why it was rejected.

The ALJ failed to acknowledge plaintiff's nearly twenty- year work history.  A strong and consistent work record is an important factor in assessing credibility about pain and inability to work.  *Dobrowolsky v. Califano*, 606 F.2d 403, 409-10 (3d Cir. 1979).  "[W]hen the claimant has a work record like [plaintiff's] – twenty-nine years of continuous work, fifteen with the same employer – his testimony as to his capabilities is entitled to substantial credibility." *Id.* at 409.  Here, too, the court finds that the ALJ needed to explain why plaintiff's twenty years of continuous work, ten with the same employer, should not merit consideration.

The ALJ's failure to address plaintiff's subjective complaints of pain and long work history in his decision was error.[13]  This case must be remanded to the Commissioner for further consideration.

**B. Failure to address diagnoses of annular tears**

In this case, the ALJ conducted his analysis by considering that all the medical source opinions were consistent.  This conclusion, however, is not supported by the record.  Most notably, as plaintiff points out, the ALJ considered Dr. Kramer's diagnosis of annular tears to be a diagnosis of degenerative back pain, based upon the ALJ's observation that the annular tears did not result in any nerve root impingement.  (R. at 24-25.)  This conclusion, however, is contradicted by the deposition testimony of Dr. Cosgrove, a one-time consultative examiner, whom the ALJ cited as support for his position.  Dr. Cosgrove testified:

> Q.    Is it fair to say that discogenic pain syndrome is a problem with the disk [sic] itself as opposed to the disk [sic] hitting a nerve root?
>
> A.    Correct.  It is not because of the pressure on the nerve root, and when - - it is not due to any of the surrounding structures such as the facet joints or the muscles.
>
> When you see the term discogenic, it is referable to the actual disk [sic] itself, either the annulus or the central part of the nucleus pulposus.

---

[13]It is problematic that the ALJ did not address plaintiff's longitudinal treatment for pain or the side effects of plaintiff's medications, particularly Vicodin, or include the side effects of her medications in the hypothetical posed to the VE.  *See* 20 C.F.R. 404.1529(c)(3)(iii); SSR 96-7P, 1996 WL 374186, at *8 ("In general, a longitudinal medical record demonstrating an individual's attempts to seek medical treatment for pain or other symptoms and to follow that treatment once it is prescribed lends support to an individual's allegations of intense and persistent pain or other symptoms for the purposes of judging the credibility of the individual's statements.); *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987).

Q.     Okay.  When the disk [sic] itself is damaged, that can be painful for a person; is that correct?

A.     It can be.  This is an area somewhat controversial.  There are nerve fibers that do innervate the outer annulus of the disk [sic].  What is controversial is that some individuals have significant annular tears or disk [sic] disruptions, but no pain at all.  And other individuals may have minimal annular disruptions or tears and have significant pain.

So correlating pain complaints with annular and disk [sic] architecture is always very difficult.

(R. at 233-34.)

The difference between annular tears and herniated discs was explained by Dr. Kramer during his deposition, but was not addressed by the ALJ:

A herniated disk [sic] is where the back portion of the disk [sic] actually ruptures and disk [sic] contents and material protrude and extend into the spinal canal usually compressing nerves.  The annular tear is when - - I'll make an analogy.  When someone says you have a hole in your car tire, even though there's no disk [sic] material that is extruded through the little hole within the disk [sic], there are potentially very noxious substances within the disk [sic] space that can leak out causing not only low back pain as well as leg pain.

In addition, there are nerve endings that are specifically located over the back of the disk [sic] which are obviously stimulated by a tear in the back part of this area.

(R. at 313).

Dr. Kramer distinguished annular tears and degenerative back problems in plaintiff's case:

Q.     Particularly in this case, the degenerative changes that you saw, what did you attributes [sic] them to?

A.     I think those predated her injury and are part of the aging process.

Q.     Given the fact that she did have degenerative changes that were not part of the work injury, how were you able to conclude that

20

> the annular tears at L4-5 and L5-S1 were attributable to the work injury?
>
> A.   Because most people with degenerative disk [sic] disease don't always have annular tears in association.  In addition, her pain syndrome in light of the MRI findings perfectly correlated.

(R. at 314-15.)

The diagnosis of annular tears was recognized by Dr. Klein, plaintiff's longitudinal treating physician.  (R. at 346.)  Notably, there is no medical opinion contained in the record that a diagnosis of annular tears is synonymous with degenerative back pain in the absence of nerve root impingement.  The medical conclusion noted by the ALJ is not supported by the record.  This matter needs to be remanded for the ALJ to consider how the diagnosis of annular tears may affect his determination.  On remand, the ALJ may order a consultative medical exam to resolve any issue concerning this matter.  20 C.F.R. § 404.1527(c)(3).

### C.  Weight afforded to opinions of treating physicians

Schilo argues that the ALJ's decision was flawed because he failed to assign greater weight to the opinions of her treating physicians and lesser weight to the opinions of consultative physicians.  The Commissioner disputes that argument by asserting that the weight given by the ALJ to the medical opinions contained in the record is supported by substantial evidence and that plaintiff's argument is nothing more than a request for this court to reweigh impermissibly the evidence of record.

"A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect "expert judgment based on a continuing observation of the patient's condition over a prolonged period of time."'" *Morales v. Apfel*, 225 F.3d 310, 317 ((3d Cir. 2000) (quoting *Plummer v. Apfel*, 186 F.3d 422, 429

(3d Cir. 1999) (quoting *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir. 1987))).  Where the

opinion of a treating physician conflicts with that of a nontreating physician, "the ALJ may choose

whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" *Morales*, 225

F.3d at 317 (quoting *Plummer*, 186 F.3d at 429 (citing *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d

Cir. 1993))).  When choosing to reject a treating physician's opinion, "an ALJ may not make

'speculative inferences from medical reports' and may reject 'a treating physician's opinion

outright only on the basis of contradictory medical evidence' and not due to his or her own

credibility judgments, speculation or lay opinion."  *Morales*, 225 F.3d at 317 (quoting *Plummer*,

186 F.3d at 429).  Where there is conflicting evidence, the administrative law judge must not only

discuss evidence that supports his or her determination, but also explain the evidence that he or

she rejects.  *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981) (citing *Dobrowolsky*, 606 F.2d

403); *see Wisniewski v. Comm'r of Soc. Sec.*, 210 Fed. App'x 177 (3d Cir. 2006) (clarifying

*Cotter*).

> "In our view an examiner's findings should be as comprehensive and
> analytical as feasible and, where appropriate, should include a statement
> of subordinate factual foundations on which ultimate factual
> conclusions are based, so that a reviewing court may know the basis for
> the decision.  This is necessary so that the court may properly exercise
> its responsibility under 42 U.S.C. § 405(g) to determine if the
> Secretary's decision is supported by substantial evidence."

*Cotter*, 642 F.2d at 705 (quoting *Baerga v. Richardson*, 500 F.2d 309, 312 (3d Cir. 1974)).

The ALJ failed to explain adequately the weight given to the conflicting medical evidence

of record, and in some instances did not acknowledge that conflicting evidence existed in the

record.  For example, the ALJ stated that Dr. Kramer's opinion was consistent with the other

medical opinions of record that plaintiff was capable of performing light work.  Dr. Kramer

testified, however, that "I would place her at absolutely no lifting greater than even five pounds." (R. at 317.)  To be capable of light work requires, among other things, any ability to lift up to ten pounds.  20 C.F.R. 404.1567(b).  The ALJ did not explain why that limitation was not credited. To the extent that the ALJ credited the opinion of consultative sources over plaintiff's long-time treating physicians, he did not explain his reasons for doing so.  Under those circumstances the court is not able to conduct a meaningful review.  Because the ALJ did not adequately explain the medical evidence that he accepted or rejected, and did not provide sufficient reasons for rejecting the opinion of plaintiff's treating sources, this court must remand this case.

### D.  Weight afforded to decision of the worker's compensation judge

Plaintiff's final argument concerning the sufficiency of the ALJ's decision is that the ALJ failed to give substantial weight to the decision of the workers' compensation judge who credited the testimony of plaintiff's treating physicians and found the conflicting testimony of a consultative physician to not be credible.

The Commissioner argues that an administrative law judge is not bound by a workers' compensation judge's decision and the ALJ did not err in the weight assigned to that decision.  It is well established that:

> A decision by any nongovernmental agency or any other governmental agency about whether [a claimant] [is] disabled or blind is based on its rules and is not [Social Security's] decision about whether [the claimant] [is] disabled or blind. [Social Security] must make a disability or blindness determination based on social security law.  Therefore, a determination made by another agency that [a claimant] [is] disabled or blind is not binding on [Social Security].

20 C.F.R. § 404.1504; *see also Gifford v. Barnhart*, 129 F. App'x 704, 707 (3d Cir. 2005) (recognizing that and administrative law judge is not bound by the determination of the Pennsylvania Workers' Compensation Bureau).

The United States Court of Appeals for the Third Circuit has held that disability determinations made by other government agencies, while not binding, are entitled to substantial weight. *Kane v. Heckler*, 776 F.2d 1130, 1135 (3d Cir. 1985); *Lewis v. Califano*, 616 F.2d 73, 76 (3d Cir. 1980). Therefore, "[i]f the ALJ reaches a contrary conclusion, the ALJ must offer an explanation of why he rejected the other agency's finding." *Sell v. Barnhart*, No. Civ.A.02-8617, 2003 WL 22794702, at *3 (E.D.Pa. Nov. 17, 2003) (citing *Lewis v. Califano*, 616 F.2d 73, 76 (3d Cir. 1980)); *see Somenski v. Barnhart*, No. Civ.A.05-345, 2006 WL 494997, at *9 (E.D.Pa. Feb. 28, 2006).

The court, recognizes that different standards govern the decisions of the Pennsylvania Workers' Compensation Bureau and the SSA. For purposes of workers' compensation, plaintiff only needed to show that she was disabled from her previous work. In order to receive an award of benefits under the Act, an administrative law judge must determine where a plaintiff is disabled from all work activity. Thus, the ALJ need not afford significant weight to the disability finding made by the Pennsylvania Workers' Compensation Bureau. Portions of the workers' compensation judge's decision that considered medical findings, however, should be evaluated by the ALJ. *Coria v. Heckler*, 750 F.2d 245, 247 (3d Cir. 1984). "The ALJ should not . . . ignore the underlying objective medical findings in the physician's reports, but should instead evaluate those findings by the same standards he or she would use in evaluating medical findings made in the

first instance for Social Security claims." *Rose v. Chater*, No. Civ.A. 94-4421, 1995 WL 365404, at *6 (E.D.Pa. Jun. 15, 1995) (citing *Coria*, 750 F.2d at 248).

The ALJ's failure to address the underlying findings of the Pennsylvania workers' compensation judge at all was error.

## VI.    CONCLUSION

The ALJ's evaluation of plaintiff's condition and RFC cannot be meaningfully evaluated by this court unless the ALJ explains why plaintiff's testimony concerning her pain was not fully credited, why the diagnosis of annular tears was not credited, why her treating physician's findings regarding her limitations were not afforded weight and why the workers' compensation judge's findings were not considered.  For reasons discussed above, the plaintiff's motion is granted to the extent that it seeks remand, and the Commissioner's motion is denied.  The case is remanded to the Commissioner for proceedings consistent with this opinion.  An appropriate order shall issue.

By the court,


/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge


Dated: February 18, 2010